RAMONA W. ERICKSON AND ANOTHER
v. SUNSET MEMORIAL PARK ASSOCIATION, INC.

108 N. W. (2d) 434.

March 24, 1961—No. 38,091.

*Carl K. Lifson*, for appellant.
*Sheldon D. Karlins* and *Richard F. Sachs*, for respondents.

Murphy, Justice.

The plaintiffs, Ramona W. Erickson and David E. Erickson, prevailed in a declaratory judgment action in which the court below held that a restrictive covenant in a deed issued to the plaintiffs by the defendant, Sunset Memorial Park Association, Inc., which denied burial to one who was not a Caucasian was void under the statutes and public policy of the State of Minnesota. The defendant cemetery appeals.

The plaintiff Ramona W. Erickson is a full-blooded American Indian. Her husband, David E. Erickson, is a Caucasian. On August 26, 1955, the plaintiffs purchased a burial lot from the defendant. The printed application to purchase, which was signed by the Ericksons, contained the clause:

"The undersigned Purchaser(s), who represent(s) himself (herself) (themselves) to be a member or members of the Caucasian race, hereby make(s) application to purchase certain burial space * * *."

The deed issued to the plaintiffs contains the following condition:

"The party of the second part [the Ericksons] covenants and agrees that said property hereby conveyed shall be used only for the interment or burial of deceased persons of the Caucasian race * * *."

On April 18, 1958, after Mrs. Erickson had informed the cemetery authorities that she was of Indian descent, they advised her by letter that they could not permit her to be interred on the property. They advised her that from the $360 paid for the lot certain expenses had been incurred, including a 20-percent assessment for perpetual care of the property, and that the maximum they could offer her, if she wished to sell, would be $198.

The answer of the defendant corporation alleged that its rules and regulations governing use of its cemetery limited interment in the cemetery to members of the Caucasian race, and that if the officer who had executed the acceptance of the plaintiffs' purchase application had known that Mrs. Erickson was an Indian, defendant would not have issued the deed. The answer does not allege fraud or deceit in the procurement of the deed. At most it alleges mistake and misrepre-

sentation as to the race of one of the grantees. It asserts the restrictive covenant as a defense to the plaintiffs' action and asks that the relief demanded by the complaint be denied and that it have its costs and disbursements.

The trial court granted judgment on the pleadings, being of the view that the restrictive covenant was void under the laws of Minnesota and the public policy of this state. In support of his conclusion, he quoted from the concurring opinion of Mr. Justice Dooling in Long v. Mountain View Cemetery Assn. 130 Cal. App. (2d) 328, 330, 278 P. (2d) 945, 946, as follows:

"* * * I cannot believe that a man's mortal remains will disintegrate any less peaceably because of the close proximity of the body of a member of another race, and in that inevitable disintegration I am sure that the pigmentation of the skin cannot long endure. It strikes me that the carrying of racial discrimination into the burial grounds is a particularly stupid form of human arrogance and intolerance. If life does not do so, the universal fellowship of death should teach humility. The good people who insist on the racial segregation of what is mortal in man may be shocked to learn when their own lives end that God has reserved no racially exclusive position for them in the hereafter."

A number of important questions are raised on this appeal. They are presented by lengthy briefs which contain a great deal of able argument but little by way of helpful precedent.

■ The first point which has been stressed by the briefs and arguments of the parties, and which we now consider, relates to the application of U. S. Const. Amend. XIV as it bears upon the denial of the right of the plaintiffs to own and use the property because of the restrictive covenant in the deed. The plaintiffs argue that, if the court sustains the defense based upon a covenant discriminating against race, it is acting as an agency of the state to enforce that which Amend. XIV prohibits. The cemetery, on the other hand, argues that private agreements between citizens are not within the scope of Amend. XIV and that state action which does no more than permit a landowner to discriminate on the basis of race in selling land is constitutional

state action. Amend. XIV, § 1, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws" nor "deprive any person of life, liberty, or property without due process of law" nor "make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

In support of their respective positions the parties labor the dialectics of three important cases which deal with the vague line of demarcation between what is constitutional and what is unconstitutional state action within the scope of Amend. XIV. These cases are Shelley v. Kraemer, 334 U. S. 1, 68 S. Ct. 836, 92 L. ed. 1161, 3 A. L. R. (2d) 441; Barrows v. Jackson, 346 U. S. 249, 73 S. Ct. 1031, 97 L. ed. 1586; and Rice v. Sioux City Memorial Park Cemetery, Inc. 245 Iowa 147, 60 N. W. (2d) 110. In view of the disposition we make of the case before us, a searching analysis of these authorities is not warranted. It is enough for our purposes to briefly summarize them.

Prior to Shelley v. Kraemer, *supra,* it was held in the Civil Rights Cases, 109 U. S. 3, 3 S. Ct. 18, 27 L. ed. 835, that the provisions of Amend. XIV refer only to "state" as distinguished from "private" action. It was said in those cases that the amendment was intended to correct wrongs resulting from (109 U. S. 13, 3 S. Ct. 23, 27 L. ed. 840) "State laws, or State action of some kind, adverse to the rights of the citizen secured by the amendment." It is clear that state statutes or ordinances which compel racial discrimination are unconstitutional and within the scope of the amendment. It also appears that the amendment applies to action by the legislative, the executive, the judicial authorities, or the agents of such authorities exercising a governmental function, to aid in the enforcement of restrictive or discriminating acts or agreements. But when, if at all, a judicial determination of the rights of private parties to a contract containing discriminatory provisions as to race, color, or creed takes on the character of unconstitutional state action is not entirely clear. The three cases already referred to deal with this question.

Shelley v. Kraemer, *supra,* involved two actions, each instituted to enforce an agreement among property owners imposing a restriction against occupancy of lots within a particular area by any person not of the Caucasian race. In those cases Negroes had acquired title to

lots in the restricted areas and had gone into occupancy. In both cases the owners of the other property subject to the terms of the restrictive covenant sought injunctive relief restraining the Negroes from taking possession of the property or requiring them to move, and in one case the other property owners also sought a decree divesting the Negroes of title. The Supreme Court of the United States held that in granting judicial enforcement of the restrictive agreements in these cases the state had denied equal protection of the law. That decision recognized that a person is privileged to deal with whom he chooses and refusal to deal with one because of his race, color, or creed is private conduct not within the scope of the amendment. The court explained (334 U. S. 13, 68 S. Ct. 842, 92 L. ed. 1180, 3 A. L. R. [2d] 460):

"* * * So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated."

That decision made it clear, however, that by granting judicial enforcement of the restrictive agreements discriminating against Negroes, the state courts had denied the parties equal protection of the laws. The effect of the decisions of the lower courts was to compel others not to deal with the interested parties because of their race. It was pointed out that the state courts, by granting the injunctions, had made available (334 U. S. 19, 68 S. Ct. 845, 92 L. ed. 1183, 3 A. L. R. [2d] 463):

"* * * the full coercive power of Government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell. The difference between judicial enforcement and non-enforcement of the restrictive covenants is the difference to petitioners between being denied rights of property available to other members of the community and being accorded full enjoyment of those rights on an equal footing."

The later case of Barrows v. Jackson, 346 U. S. 249, 73 S. Ct. 1031, 97 L. ed. 1586, involved an action for damages for breach of a

covenant entered into between the owners of residential property restricting the use and occupancy thereof to persons of white or Caucasian race and obliging the signers to incorporate this restriction in all subsequent transfers. The United States Supreme Court held that the restrictive covenant could not be enforced at law by a suit for damages against a co-covenantor who broke the covenant. A Negro had purchased and gone into occupancy of premises pursuant to a conveyance by a former owner who had not incorporated the restrictive covenant into the deed. It was there held that, when parties cease to rely upon voluntary action to carry out the covenant and the state is asked to step in and give its sanction to the enforcement of the covenant, unconstitutional state action would necessarily follow. The court held that, by punishing and awarding damages for the breach, the state court would in effect encourage the use of restrictive covenants and that (346 U. S. 254, 73 S. Ct. 1033, 97 L. ed. 1594) "[t]o that extent, the State would act to put its sanction behind the covenants."[1]

The defendant relies on Rice v. Sioux City Memorial Park Cemetery, 245 Iowa 147, 60 N. W. (2d) 110. There the plaintiff brought suit for damages for breach of contract against the defendant private cemetery for refusing to bury her non-Caucasian husband. As in the case before us, the defense was that the contract provided that the cemetery would accept only "members of the Caucasian race" for burial. The Iowa Supreme Court held that there was no unconstitutional state action in giving the contract provision effect as a defense. It pointed out that "state action," within the purview of U. S. Const. Amends. V and XIV and the provisions of its state constitution, was limited (245 Iowa 157, 60 N. W. [2d] 116) "to direct action by the legislative, the executive, the judicial authorities or any person or group exercising a governmental function, to aid in the enforcement of restrictive or discriminating acts or agreements." At the risk of oversimplifying the holding in this able and closely reasoned decision, it may be said that the Iowa court took the position that in the case before it the element of "exertion of governmental power" directly in aid of discrimination or other deprivation of right was not present,

---

[1]See, also, Clifton v. Puente (Tex. Civ. App.) 218 S. W. (2d) 272.

and that in denying the plaintiff's claim it was maintaining a position of "neutrality." In further explanation of its position that the decision denying plaintiff's claim was not state action, the court said (245 Iowa 159, 60 N. W. [2d] 117):

"It is fundamental in our law that a private individual may, unless expressly forbidden by police power enactments, deal freely with whom he pleases, and his reasons or policy are not the concern of the state. The state may not aid him in certain of his restrictive or arbitrary agreements, and so here if plaintiff had herself lowered her deceased husband's body into the ground, in violation of her agreement with defendants, the State would have had to deny defendants aid in restraining her, nor could it have helped in punishing her for violating that agreement."

The Supreme Court of the United States granted certiorari and the case was affirmed per curiam by an equally divided court. Id. 348 U. S. 880, 75 S. Ct. 122, 99 L. ed. 693. However, on rehearing the court vacated its affirmance because an Iowa statute enacted after commencement of the suit bars the question presented by it from again arising in that state. Id. 349 U. S. 70, 75 S. Ct. 614, 99 L. ed. 897.[2]

It appears from the decisions discussed that a plaintiff may not enforce by judicial action discriminatory racial covenants. Such relief would involve coercive or affirmative action by a court which would be in the nature of unconstitutional state action. It also appears that a defendant in an action may invoke such a covenant as a defense. It is not necessary for us to reconcile or evaluate these decisions since the issue before us may be determined by application of principles of law contained in our constitution, statutes, and declarations of public policy.

■ We may rest our decision in this case upon Minn. St. 507.18, which makes unlawful covenants in a writing relating to real estate

---

[2]In his dissent from the latter order, Mr. Justice Black said (349 U. S. 80, 75 S. Ct. 620, 99 L. ed. 904):

"* * * We granted certiorari because serious questions were raised concerning a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment. Those questions remain undecided."

which discriminate against any class of persons because of their religious faith, race, or color. That section provides:

"Subdivision 1. No written instrument hereafter made, relating to or affecting real estate, shall contain any provision against conveying, mortgaging, encumbering, or leasing any real estate to any person of a specified religious faith, creed, race or color, nor shall any such written instrument contain any provision of any kind or character discriminating against any class of persons because of their religious faith, creed, race or color. In every such provision any form of expression or description which is commonly understood as designating or describing a religious faith, creed, race or color shall have the same effect as if its ordinary name were used therein.

"Subd. 2. Every provision referred to in subdivision 1 shall be void, but the instrument shall have full force in all other respects and shall be construed as if no such provision were contained therein.

"Subd. 3. As used in this section the phrase 'written instruments relating to or affecting real estate,' embraces every writing relating to or affecting any right, title, or interest in real estate, and includes, among other things, plats and wills; and the word 'provision' embraces all clauses, stipulations, restrictions, covenants, and conditions of the kind or character referred to in subdivision 1.

"Subd. 4. Every person who violates subdivision 1, or aids or incites another to do so, shall be liable in a civil action to the person aggrieved in damages not exceeding $500."

A deed conveying an interest in a cemetery lot is an instrument "relating to or affecting real estate" within the purview of this particular statute. Concededly, the deed here contains a provision discriminating against a class of persons, specifically non-Caucasians, because of race and color; and, if § 507.18 is applicable, it must also be conceded that the racially restrictive covenant in the deed is not only prohibited but rendered void.

But the defendant urges that § 507.18 does not apply, because it affects only instruments relating to ownership and use of land by and for living persons and does not relate to instruments conveying burial rights in cemetery land. In support of this argument the defendant

refers to § 327.09, the so-called "accommodation statute," which has application to discrimination in "theaters, or other public places of amusement, or by hotels, barber shops, saloons, restaurants, or other places of refreshments, * * *." It is contended that the so-called "accommodation statute" applies only to living persons and that § 507.18 is in the same category and therefore is designed as a form of civil-rights statute concerned only with property rights of living persons in land. We agree with the trial court that this contention of the defendant is entirely without merit. In his memorandum the trial court said:

"* * * the short answer is that both Mr. and Mrs. Erickson are living persons, and the contention of defendant, if sustained, would discriminate against them and affects their ownership or use of an interest in real estate."

Moreover, § 327.09, the "accommodation statute," deals with persons denied accommodations for some reason, whereas the statute before us deals broadly with the subject of written instruments relating to real estate and strikes down those restrictive provisions in such instruments which discriminate "against any class of persons because of their religious faith, creed, race or color."

■ It is next contended by defendant that § 507.18 applies only to instruments affecting ordinary property rights in land and not to a deed granting the special property right of sepulture in cemetery land. Whether the purchaser of burial space acquires a special kind of estate in fee subject to various conditions, regulations, and restrictions coupled with the use of common cemetery facilities or a kind of perpetual easement coupled with an interest in the entire cemetery, or whether the property is a special kind of perpetual license or privilege, the fact remains that it is, nevertheless, an "interest in real estate" within the purview of the statute. Our statutes treat ownership of an interest in a cemetery lot as an interest in real estate. They provide for transfer of the interest by sale or inheritance (§§ 306.09, 306.15, 306.29, 525.14) and provide that actions by a public cemetery association to quiet title to cemetery lots may proceed in the same manner as actions to determine title to real estate (§ 306.22). Even though

a purchaser of a cemetery lot may not acquire the fee simple title to the property, he has a right in the lot which the law recognizes and protects.[3]

■ It is next contended by the defendant that § 507.18 is not applicable to a deed granting the right of sepulture, for to so apply it would necessarily result in a holding that the right to own and use lots in a cemetery maintained by a particular religious faith could not be restricted to members of that faith.

We cannot agree with this contention. It should be recognized that the defendant, Sunset Memorial Park Association, Inc., is a public cemetery as defined by § 306.87, subd. 3, which provides:

"All cemeteries heretofore started or established as public cemeteries and all cemeteries hereafter started or established, *except cemeteries established by religious corporations,* are hereby declared to be public cemeteries within the provisions of this chapter." (Italics supplied.)

Moreover, the defendant corporation operates a public burying ground which is exempt from taxation under Minn. Const. art. 9, § 1. The public nature and character of its business and interests, as reflected by the provisions of c. 306, by virtue of which the state permits it to operate, should be distinguished from the private character of cemeteries operated by religious and fraternal corporations under c. 307 and cemeteries within the purview of the last sentence of § 306.02, which recognizes the right of a public cemetery association affiliated with a religious corporation to acquire properties to be used exclusively for burial of persons of that particular faith.[4] From time immemorial cemeteries and interment in them have had a close identification with

---

[3]On the nature of the estate acquired by the purchaser of a cemetery lot, see State v. Lorentz, 221 Minn. 366, 22 N. W. (2d) 313, 163 A. L. R. 1036; Daniell v. Hopkins, 257 N. Y. 112, 177 N. E. 390, 76 A. L. R. 1367; Sockel v. Degel Yehudo Cemetery Corp. 268 App. Div. 207, 49 N. Y. S. (2d) 176.

[4]Minn. St. 306.02 reads in part as follows: "Any such cemetery association so affiliated with a religious corporation * * * may also provide for the acquisition of other cemetery properties within the state wherein bodies of persons of the same religious faith, exclusively, are to be buried."

religion. This identification is natural to religion in civilized cultures. An essential element of many religious beliefs, strongly held for centuries, has been that their communicants must be buried in consecrated ground in which only communicants of that particular faith may be buried. The right of burial in a religious or fraternal cemetery derives from membership. It is for that reason that church cemeteries are classified as private cemeteries in which the exclusive burial of communicants of a religious faith may be practiced in accordance with its beliefs.

We see no conflict between §§ 507.18 and 306.02, as the defendant suggests. A statute is to be construed, where reasonably possible, so as to avoid irreconcilable difference and conflict with another statute. The general terms of a statute are subject to implied exceptions founded on rules of public policy and the maxims of natural justice so as to avoid absurd and unjust consequences. We are not to assume that the legislature, by enacting § 507.18, which confirms the civil right of equal protection under the law, intended to infringe upon civil rights relating to freedom of religion as provided by U. S. Const. Amend. I and Minn. Const. art. 1, § 16. It seems to us that § 507.18 by necessary implication excepts private religious and fraternal cemeteries from its application. This implication is so strong in its probability that the contrary thereof cannot be reasonably supposed. Moreover, the legislature acted with full knowledge of the scope of its constitutional powers and of prior legislation on the same subject. We are not to assume that the legislature intended to overthrow long-established civil rights by including within the provisions of § 507.18 a purpose or object hostile to religious practice. Pomeroy v. National City Co. 209 Minn. 155, 296 N. W. 513, 133 A. L. R. 766.

█ It is of great importance to note that Minnesota by legislative action has clearly set its policy against all forms of religious or racial discrimination. In addition to § 507.18 and § 327.09, the so-called "accommodation statute," our legislature in 1957 enacted L. 1957, c. 953. That act contains a legislative finding and a declaration of public policy against discriminatory practices. That act provides in part:

"Section 1. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, color, creed, religion, national origin or ancestry are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces and undermines the institutions and foundations of a democratic state. The legislature hereby finds and declares that discrimination or segregation in the sale, lease, sublease, use occupancy, tenure, acquisition or enjoyment of property or housing accommodations because of race, color, creed, religion, national origin or ancestry tends unjustly to condemn large groups of inhabitants to depressed and substandard living conditions which are inimical to the general welfare and contrary to our democratic way of life. The aforementioned practices of discrimination and segregation in the sale, lease, sublease, use occupancy, tenure, acquisition or enjoyment of property or housing accommodations because of race, color, creed, religion, national origin or ancestry are declared to be against the public policy of this state.

"Sec. 2. The opportunity to buy, acquire, lease, sublease, occupy and use and enjoy property and to obtain decent living and housing accommodations without discrimination because of race, color, creed, religion, national origin or ancestry is hereby recognized and declared to be a civil right.

"Sec. 3. A commission to investigate and study discrimination and segregation because of race, color, creed, religion, national origin or ancestry in the sale, lease, sublease, transfer, use occupancy, tenure, acquisition or enjoyment of property or housing accommodations as well as investigating the possibility of strengthening the states civil rights program by encouraging the work of the governor's human rights commission and the fair employment practice commission with possible recommendations as to their organization, is hereby created to consist of five members of the senate, to be appointed by the committee on committees, and five members of the house of representatives to be appointed by the speaker. The appointment of such commission shall be made upon passage of this act.

"Sec. 4. The commission may hold meetings at such times and

places as it may designate. It shall select a chairman, and such other officers from its membership as it may deem necessary.

"Sec. 5. The commission may subpoena witnesses and records and employ such assistants as it deems necessary to perform its duties effectively. It may do all the things necessary and convenient to enable it to perform its duties.

"Sec. 6. The revisor of statutes and every other state agency shall cooperate with the commission in all respects so that its purpose may be accomplished. The commission shall use the available facilities and personnel of the Legislative Research Committee unless the commission by resolution determines a special need or reason exists for the use of other facilities or personnel.

"Sec. 7. The commission shall report to the legislature on or before January 15, 1959, setting forth its recommendations."

It was on the basis of the foregoing declaration of public policy, and on his interpretation of § 507.18, that the lower court concluded that the racial restrictive covenant in this case was against Minnesota's public policy.

■ It is our view that defendant's argument that public policy declared by L. 1957, c. 953, cannot be given retroactive effect is without merit. The defendant relies on § 645.21, which provides:

"No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."

Although the policy of respect for the civil rights of all citizens, as expressed by c. 953, may not have always been honored by universal observance, it cannot be truly said that the policy of our state has ever been otherwise. That chapter expresses principles of basic human justice which are broadly stated in the Declaration of Independence and which from time to time have been delineated by various amendments to the Constitution.[5] Moreover, Minn. Const. art. 1, § 2, provides in part:

[5]Amend. I — Freedom of religion, speech, and press; Amend. II — Right to bear arms; Amend. III — Quartering of soldiers; Amend. IV — Security against search; Amend. V — Due process of law; Amend. VI —

"No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers."

In Thiede v. Town of Scandia Valley, 217 Minn. 218, 224, 14 N. W. (2d) 400, 405, in discussing rights and privileges secured to citizens under Minn. Const. art. 1, § 2, we said:

"The entire social and political structure of America rests upon the cornerstone that all men have certain rights which are inherent and inalienable. Among these are the right to be protected in life, liberty, and the pursuit of happiness; the right to acquire, possess, and enjoy property; and the right to establish a home and family relations — all under equal and impartial laws which govern the whole community and each member thereof. * * * The rights, privileges, and immunities of citizens exist notwithstanding there is no specific enumeration thereof in state constitutions."

■ The final point raised by the defendant is not clearly defined. It appears to be its contention that it has an equitable right to rescind and cancel the deed because of "mutual mistake or fraudulent misrepresentation as to a fact material to the transaction." It should be noted, however, that the defendant by its answer does not allege fraud or deceit on the part of the plaintiffs in procuring the deed nor ask for relief by way of equitable rescission. The most that can be said for the asserted defense is that it alleges a mutual mistake or misrepresentation of fact as to the race or nationality of Ramona Erickson. It is clearly provided by § 507.18 that restrictive covenants discriminating against race are void, "but the instrument shall have full force in all other respects and shall be construed as if no such provision were contained therein." We agree with the trial court that the pleadings before him did not assert that a mistake or misrepresentation occurred as to a material fact. In this connection it should be noted

Right to speedy trial; Amend. VII — Right to trial by jury; Amend. VIII — No cruel punishment; Amend. XIII — Abolishing slavery; Amend. XIV — Equal protection of the laws; Amend. XV — Negro suffrage; Amend. XIX — Woman suffrage.

that we do not have before us the claim that the defendant was deprived of the right to sell to whom it chose by the fraud or deceit of the plaintiffs. That issue was neither pleaded nor argued. It cannot be fairly said that one is entitled to relief by way of equitable rescission under circumstances where he bases his claim for relief upon a restrictive covenant which the law condemns. A decree granting such relief would take land from a purchaser for value because she is a member of a minority race. We agree with the trial court that the mistake or misrepresentation upon which the defendant relies for rescission was not a mistake of any fact which under the law was a material element of the transaction. Thwing v. Hall & Ducey Lbr. Co. 40 Minn. 184, 187, 41 N. W. 815, 816; C. H. Young Co. v. Springer, 113 Minn. 382, 386, 129 N. W. 773, 774; Becker v. Bundy, 177 Minn. 415, 225 N. W. 290; Olson v. Shephard, 165 Minn. 433, 436, 206 N. W. 711, 712.

Affirmed.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.